IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-10681
_____

JOSEPH C. KETTLES,

Plaintiff-Appellant,

versus

PETROLEUM HELICOPTERS, INC.,
a Delaware Corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court for
the Northern District of Texas
(3:94-CV-25-H)
_____

July 11, 1996

Before REAVLEY, GARWOOD and JOLLY, Circuit Judges.

PER CURIAM:[*]

Plaintiff/appellant Joseph C. Kettles appeals the district court's grant of summary judgment entered in favor of defendant/appellee Petroleum Helicopters, Inc. (PHI), on Kettles's claims for defamation, tortious interference with business relations, and intentional infliction of mental distress.  We affirm.

_____

[*]  Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1992, Kettles was the West Africa area manager and check airman for PHI, a world-wide helicopter company primarily providing helicopter transport to offshore oil rigs. As check airman Kettles was responsible for recurrent flight training and check rides for PHI's pilots in Angola. Kettles was also an independent aviation consultant providing expert advice to attorneys in aviation litigation.

This dispute arose out of a helicopter accident on March 15, 1992, involving Kettles, the pilot-in-command, and Mike Jimison, the pilot Kettles was instructing when the accident occurred. During an impromptu evaluation, Kettles simulated a high side governor failure and demonstrated the proper emergency procedure to follow.[1] According to Kettles, Jimison caused the accident when, without warning and against instructions, he put the governor switch into manual during the mock emergency, causing an engine to catch fire and forcing Kettles to take control and land on the deck of a passing ship.

---

[1]A governor is a device that automatically regulates the amount of fuel going to the helicopter's engine. The governor may fail high (allowing too much fuel to the engine) or low (allowing too little).

Following customary practices, PHI convened a safety board to investigate the accident and issue a safety report.[2] The report described the incident, the board's conclusions, and the board's ultimate recommendations. The report was sent to many employees within the company, including area managers, base maintenance managers, quality assurance personnel, and members of the roving maintenance team. After the incident, Kettles was denied a safety award and was removed as a check airman. He did not lose any pay and remained West Africa area manager.

In January 1993 Kettles received a call from an aviation litigation defense attorney for whom he was consulting. The lawyer had heard about the accident and administrative action involving Kettles and demanded an explanation. Kettles sent a letter describing the report's conclusions and his own explanation to the lawyer, who continued to retain Kettles as a consultant. Kettles sent similar letters to his other clients.

Kettles brought this diversity suit against PHI, claiming that its report of the accident defamed him, interfered with his budding consulting business as an expert in litigation involving helicopter accidents, and constituted intentional infliction of mental distress. The district court found that Kettles had not proved any damages for the defamation and tortious interference

---

[2]The safety board was comprised of Kettles's supervisor, PHI's chief pilot, PHI's assistant safety director, PHI's director of training, PHI's director of maintenance, an instructor from the training department, and a line pilot.

claims; that Kettles had not argued the report was libelous per se and in any event the report was not libelous per se; and that Kettles had no intentional infliction claim because PHI's conduct was not extreme and outrageous.  In finding no evidence of damages, the court struck the entire original affidavit and portions of the supplemental affidavit of Larry Boles, Kettles' expert witness.

On appeal, Kettles argues that the district court erred in striking Boles's affidavits, and that even if the affidavits were properly struck, the district court erred in concluding that no genuine issues of material fact existed for any of the three claims asserted.

ANALYSIS

We review the grant of summary judgment de novo.[3]  We may affirm a summary judgment on any valid grounds, and are not limited to the reasoning employed by the district court in reaching its own decision.[4]  A trial court's ruling on the

---

[3]Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1109 (5th Cir. 1991), cert. denied, 503 U.S. 912, 112 S.Ct. 1280 (1992).

[4]Coral Petroleum, Inc. v. Banque Paribas--London, 797 F.2d 1351, 1355 n.3 (5th Cir.), rh'g denied, 801 F.2d 398 (5th Cir. 1986).

admissibility of expert testimony is protected by an ambit of discretion and will be sustained unless manifestly erroneous.[5]

A. Defamation

A defamation plaintiff must prove that the allegedly defamatory statements are false and that the defendant's publication of the statements proximately caused the plaintiff's damages.[6]  In a libel action the initial question, which is a question of law, is whether the words used were reasonably capable of a defamatory meaning.[7]  The court must construe the statement as a whole in view of the surrounding circumstances based upon how an ordinary reader would perceive the entire statement.[8]  Only if the court determines that the language is ambiguous should the jury determine the statement's meaning.[9]

We find no ambiguity in the safety report and hold that it is not defamatory as a matter of law.  The safety report first describes the events preceding, during, and succeeding the

---

[5]Christopherson, 939 F.2d at 1109.

[6]Brown v. Petrolite Corp., 965 F.2d 38, 43 (5th Cir. 1992).

[7]Musser v. Smith Protective Servs., Inc., 723 S.W.2d 653, 654-55 (Tex. 1987).

[8]Brown, 965 F.2d at 43 (citing cases); Musser, 723 S.W.2d at 655.

[9]Musser, 723 S.W.2d at 655.

accident.  The report then reaches four conclusions about the incident, to be discussed below.  Next, the report indicates that it is to serve as a written reprimand and that Kettles, but not Jimison, is disqualified for a safety award.  Finally, the report recommends that Kettles should not be retained as a check airman; that Jimison should undergo a post-incident check ride; and that the company should reevaluate both the desirability of having area managers serve as check airmen in remote locations, and the necessity for check pilot recurrent training.

The report reaches four conclusions, set out verbatim below:

1.) The check pilot was well aware that high side governor failure demonstrations are not included in the approved company training manual.  This emergency procedure is to be covered orally.

2.) The check pilot did not follow good, standardized practices.  There was no plan of actin (sic) for the checkride and no oral prior to the flight.  No preparations led the pilot to expect a check ride, in fact he believed the only reason the check pilot was going along on this flight was to take aerial photos.  Only at the time of closing one throttle to idle while at a hover, did the check pilot mention the possibility of this trip becoming a check ride.

3.) Good cockpit resource management was not utilized in either the simulated high side governor failure, nor in the actual emergency that followed.  This was evidenced by the fact that there was no discussion regarding confirmation by both pilots prior to moving any switches and throttles.

4.) The checklist was not used.

Kettles cannot deny that he was aware, as conclusion one states, that high side governor failures were to be covered only orally. The cockpit recording preceding the accident reveals that Kettles was aware that high side governor failures were not part of the standard PHI training program. Kettles does not assert in his brief that conclusion 1 is false.

Kettles complains that conclusion 2 is false, but he admitted in his deposition that he did not announce a plan of action for the check ride before he and Jimison got into the helicopter; that there was no oral prior to flight; and that he had done nothing before the flight to lead Jimison to believe he was to be getting an update on his check ride. Given these admissions, there is nothing defamatory about conclusion 2.

Kettles complains that conclusion 3 is false because it faults Kettles for not using "good cockpit resource management." As PHI points out, conclusion 3 faults both Kettles and Jimison for not giving verbal confirmations prior to moving switches or throttles. The safety report notes that during the mock emergency Kettles failed to give confirmation to Jimison after identifying the number 2 governor switch. Kettles has not disputed the truth of this statement on appeal. Furthermore, Kettles admitted in deposition that he and Jimison did not speak to each other during the actual emergency and did not follow normal, usual and customary crew coordination.

7

Kettles complains that conclusion 4 is false, but again he admitted in deposition that after the actual emergency he did not call for or use a checklist.

Finally, Kettles argues that the report as a whole is false and defamatory because its overall effect is to fault Kettles for the accident.  We believe that those in charge of safety must have some discretion in determining the cause of accidents, in reporting them, and in using accident reports to improve safety in the future.  It is clear that the primary focus of the safety report is on the failure to follow company procedures and the role that this failure played in the accident.  Thus the report emphasized that (a) Kettles sprang the check ride on Jimison with no warning; (b) Kettles and Jimison did not give proper confirmations; and (c) the check ride covered an emergency procedure that Kettles knew was to be covered only orally. Pointing this out in a safety report is not defamatory.

Even if we considered the safety report to be ambiguous with regard to its defamatory nature, we would still hold for PHI on numerous grounds.  We will only briefly discuss two of them. First, there is no evidence in the record that any third party has understood the safety report to be defamatory.  Without such evidence, Kettles cannot support an action for defamation.[10]

---

[10]See Farias v. Bexar County Bd. of Tr. for M.H.M.R. Servs., 925 F.2d 866, 878 (5th Cir.), cert. denied, 502 U.S. 866, 112 S.Ct. 193 (1991) (citing Texas cases); Adler v. American Standard Corp., 830 F.2d 1303, 1307 (4th Cir. 1987).

Second, the evidence indicates that publication of the safety report was protected by a qualified privilege. Whether a qualified privilege exists is a question of law.[11] Under Texas law, "[a] qualified privilege comprehends communications made in good faith on subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty."[12] References and accusations made by an employer about an employee to one with a common interest clearly come within this doctrine.[13]

Kettles does not argue that PHI published the report to those outside the company. Rather, Kettles argues that the safety report was distributed too widely within PHI, to officials and employees around the world who had no common interest in the contents of the report. Kettles cites no case law indicating that publication within a company is not privileged, and on these facts we refuse to so limit the privilege. The report emphasized the importance of following company procedures, and was therefore of broad interest to many in the company, even those not dealing directly with pilots. We are reluctant in the extreme to tell the safety director of a helicopter transport company how to do

---

[11]Boze v. Branstetter, 912 F.2d 801, 806 (5th Cir. 1990).

[12]Id. (quoting Houston v. Grocers Supply Co., Inc., 625 S.W.2d 798, 800 (Tex.Ct.App. 1981).

[13]Duffy v. Leading Edge Products, Inc., 44 F.3d 308, 312 (5th Cir. 1995).

his job.  There is nothing in this record to indicate that those who sent and received the report lacked a common interest in safety.

Kettles also complains that a PHI employee informed a third-party aviation consultant about the accident and the subsequent investigation.  Even if this were a "secondary publication," it does not destroy the privilege.  Unauthorized gossip spread by employees does not take the employer outside the scope of their qualified privilege.[14]

At oral argument, Kettles's counsel argued that Kettles was forced to publish the conclusions of the safety report to attorneys for whom he was consulting once they learned of the administrative action taken against him.  Kettles failed to brief the issue of self-compelled publication.  We consider the argument waived.[15]

The qualified privilege is lost if the plaintiff shows that the statements were published with actual malice.[16]  In order to show actual malice, a plaintiff must show that a defendant published the statement knowing it to be false, or with a high

_____

[14]Danawala v. Houston Lighting & Power Co., 14 F.3d 251, 255 (5th Cir. 1993).

[15]However, we note that after Kettles showed the report to the attorney, the attorney continued to employ Kettles and Kettles has introduced no evidence that the attorney understood the safety report to be defamatory.

[16]Id.

degree of awareness of its probable falsity.[17]  Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show actual malice.[18]  Only clear and convincing proof of malice will defeat the defendant's privilege.[19]

Kettles has presented insufficient evidence to raise a genuine issue of fact that the report was published with actual malice.  At most, Kettles presented the affidavit of Boles, who speculated about the mindset of members of the safety board. Initially, we find no error in the district court's evidentiary rulings striking these portions of Boles's affidavit, for the affidavit made no showing that Boles was familiar with PHI's safety board or had any direct knowledge of their deliberations or analysis in arriving at their conclusions.  But even if we considered Boles competent to testify on such matters, his speculations about what the board members must have known or thought fall short of the quantum of proof necessary to raise a genuine issue of fact regarding actual malice.

---

[17]Id.

[18]Duffy, 44 F.3d at 313.

[19]Id.; Howell v. Hecht, 821 S.W.2d 627, 630 (Tex.App.-- Dallas 1991, writ denied).

11

B. Tortious Interference and Intentional Infliction

In order to prevail on a claim of tortious interference with business relations, a plaintiff must prove: (1) the existence of an economic right subject to interference; (2) willful and intentional acts of interference; (3) legal malice; (4) proximate cause; and (5) actual damage.[20] Kettles asserts that the economic right subject to interference was his aviation consulting business. We fail to see how PHI interfered with that business, and our disposition of the defamation claim disposes of the elements of intent and malice.

In order to prevail on a claim of intentional infliction of mental distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused emotional distress; and (4) the emotional distress was severe.[21] Whether a defendant's conduct may reasonably be considered extreme and outrageous is a question of law.[22] Texas courts have defined outrageous conduct as that which goes beyond all possible bounds of decency and is atrocious and utterly intolerable in a

_____

[20]Cadle Co. v. Schultz, 779 F.Supp. 392, 401 (N.D. Tex. 1991).

[21]Danawala, 14 F.3d at 256.

[22]Id.

12

civilized community.[23]  There is nothing in this record, viewed in the light most favorable to Kettles, that leads to a reasonable inference that PHI's conduct was extreme or outrageous.

AFFIRMED.

---

[23]*Id.*